UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

                                   **MEMORANDUM AND ORDER**

    -against-                          12-CR-774 (KAM)


IMRAN ISMILE BADOOLAH

                         Defendant.
------------------------------------X

**MATSUMOTO, United States District Judge:**

        Presently before the court are defendant Imran Ismile

Badoolah's ("defendant") motions to (i) dismiss the indictment,

(ii) suppress evidence seized pursuant to a search warrant at

his residence on December 17, 2012, (iii) obtain a bill of

particulars, (iv) compel pretrial disclosure of the government's

witness list and Jencks Act material, (v) compel immediate

identification of government informants and unindicted co-

conspirators, and (vi) compel immediate disclosure of other

discovery pursuant to *Giglio v. United States*, 405 U.S. 150

(1972) and *Brady v. Maryland*, 373 U.S. 83 (1963).  For the

reasons set forth below, defendant's motions are denied in their

entirety.

**BACKGROUND**

        On December 14, 2012, a grand jury indicted defendant

on one count of conspiracy to commit bank and wire fraud, in

violation of 18 U.S.C. § 1349, and four counts of bank fraud, in

1

violation of 18 U.S.C. § 1344.  (ECF No. 1, Indictment dated 12/14/12.)  According to the indictment, defendant recruited individuals who had good credit scores, but lacked the income and assets needed to obtain mortgage loans, to serve as straw buyers of properties in exchange for fees.  (*Id.* at 5-6.) Defendant also allegedly prepared and oversaw the preparation of mortgage loan applications that contained numerous material misrepresentations to make the straw buyers appear creditworthy, such as inflated incomes and bank account balances, and also falsely stated that the straw borrowers would reside at the properties even though the borrowers had no intention of doing so.  (*Id.* at 6.)  Many of the straw borrowers failed to make mortgage payments to the lenders, and the mortgage loans for the properties subsequently defaulted.  (*Id.*)

Following defendant's indictment, Magistrate Judge Vera M. Scanlon signed an arrest warrant authorizing the arrest of defendant.  (ECF No. 33, Mem. in Opp. dated 9/20/13 ("Opp."), Ex. A ("Arrest Warrant").)  This arrest warrant is dated "12/14/2002," but, because defendant was not indicted until December 14, 2012, the "2002" in the arrest warrant appears to be, and the court deems it as a typographical error, given that Magistrate Judge Scanlon was not appointed a Magistrate Judge until 2012.  (*See id.*)

On December 17, 2012, government agents executed the arrest warrant at defendant's residence, the first floor of 117-47 133rd Street in South Ozone Park, New York. (ECF No. 32, Mem. of Law in Supp. of [Def.'s] Pretrial Motion ("Mot.") dated 9/3/13, Ex. C, Aff. in Supp. of Search Warrant ("Trebelhorn Aff.") at 7.) In his affidavit in support of a search warrant on December 17, 2012, FBI Special Agent Bryan Trebelhorn attested that a co-conspirator who pleaded guilty and cooperated with the government ("CW") told agents that he/she had signed a letter to a lender which contained false information at defendant's residence, and that a second co-conspirator who is cooperating with authorities ("CS") had witnessed defendant and others preparing fraudulent documents used in furtherance of the mortgage fraud scheme at defendant's residence. (*Id.* at 6-7.) Agent Trebelhorn also attested that government agents had independently corroborated statements provided by the CS and CW. (*Id.*)

Agent Trebelhorn also averred in his search warrant affidavit that, while executing the arrest warrant, agents had conducted a protective sweep of defendant's residence and observed a pile of documents in plain view on top of a desk in the front room of the residence that featured the names of known front companies created by defendant and listed on mortgage applications submitted to lenders as employers of straw

borrowers even though they did not in fact employ the straw
borrowers, including one computer company that employed a straw
borrower identified as John Doe. (*Id.* at 8.) Agent Trebelhorn
further attested that, in the middle room, agents saw in plain
view a folder bearing the name of straw borrower John Doe, a
folder labeled with the address of a property purchased by John
Doe on behalf of defendant, a folder with the address of a
property purchased by another straw borrower identified as Jane
Doe on behalf of defendant, and a paper with the address and
contact information for the computer company that purportedly
employed John Doe. (*Id.* at 5, 8-9.) Agent Trebelhorn averred
that, based on his involvement in and experience with fraud
investigations, there was probable cause to believe that
evidence related to the criminal activity by the defendant was
located at his premises. (*Id.* at 9.)

Finally, according to the government's submissions,
the agents repeatedly knocked on the front door of defendant's
residence for approximately fifteen minutes while identifying
themselves and observed, through the windows of the residence,
the defendant running through various rooms and between the
first and second floors. (Opp. at 2.) Additionally, the
government has stated that agents saw defendant repeatedly
assume a crouching position and, as a result, assumed he was
hiding or destroying physical evidence. (*Id.*) The agents also

observed an unknown person leave the residence through a door in the basement.  (*Id.*)  After the defendant opened the door and allowed the government agents to enter, the agents handcuffed the defendant and asked for other occupants to gather on the first floor.  (*Id.*)  The government states that the individuals who came down to the first floor gave inconsistent answers regarding the total number of people in the residence and they found a toy gun that was an authentic replica of a real firearm. (*Id.*)  The government asserts that the agents did not search the premises until receiving judicial authorization for a search warrant from Magistrate Judge Robert M. Levy, which was supported by Agent Trebelhorn's affidavit including information obtained from the agents' execution of the arrest warrant.  (*Id.* at 3; *see also* Mot. Ex. B. dated 12/17/12 ("Search Warrant").)

In an affidavit in support of his motion, defendant alleges that the agents slammed him to the floor, forcibly grabbed members of his family, opened file cabinets, and repeatedly typed at a computer.  (ECF No. 32-1, Aff. in Supp. of Mot. dated 9/3/13 ("Badoolah Aff."), at 1-2.)  Defendant also claims, *inter alia*, that an agent pointed a gun at him and that the computer company that Agent Trebelhorn averred was a front company was not in fact a front company.  (*Id.* at 5, 7.)  In an affidavit, defendant's daughter states, *inter alia*, that she saw agents pointing a gun at her father while he was face down on

the floor and that she saw agent walk into the back room where her father was being held and ask him about the contents of the folders.  (ECF No. 38, Reply in Supp. of Mot. to Suppress ("Reply") Ex. 4, Aff. of Aleema Imran Ishmile dated 10/18/13, ¶¶ 5, 8.)  Defendant's first wife submitted an affidavit claiming that she saw agents in the living room on the third floor pulling open file cabinets.  (Reply Ex. 4, Aff. of Jameran Shaw dated 10/18/13, ¶ 4.).

On December 17, 2012, defendant was arraigned on the Indictment and entered a plea of not guilty on all counts. (Minute Entry dated 12/17/12.)  Defense counsel filed the instant motions on September 3, 2013, and an evidentiary hearing on the motion to suppress was held on March 3, 2014, March 26, 2014, and July 9, 2014.[1]

## DISCUSSION

## I.  Motion to Dismiss the Indictment for Pre-Indictment Delay

The first issue for the court is whether the indictment should be dismissed because of the government's delay in bringing charges against defendant.  Defendant argues that, although he was indicted within the relevant statute of limitations period, he has been unable to locate a key witness as a result of the delay, rendering him unable to defend himself.  (Mot. at 4-6.)  The government responds that defendant

---

[1] The testimony from the hearings is summarized below in the discussion of defendant's motion to suppress.

has not demonstrated that he was actually prejudiced by any delay and that the government is not required to file charges as soon as probable cause exists. (Opp. at 4-7.)

### a. Legal Standard

A defendant seeking dismissal of an indictment based on pre-indictment delay must show that (1) the defendant suffered actual and substantial prejudice as a result of the delay; and (2) the government intentionally caused the delay in order to obtain a "tactical advantage" over the defendant. *United States v. Marion*, 404 U.S. 307, 324 (1971); *see also United States v. Cornielle*, 171 F.3d 748, 752 (2d Cir. 1999). The "heavy burden" of establishing both elements rests with the defendant. *Cornielle*, 171 F.3d at 752.

### b. Application

The defendant has failed to meet his burden of establishing impermissible pre-indictment delay. First, defendant has not demonstrated that he was actually prejudiced by any delay.[2] *See United States v. Birney*, 686 F.2d 102, 105-106 (2d Cir. 1982) (proof of actual prejudice "must be definite and not speculative"). The only basis that defendant offers for finding that he was actually prejudiced by the delay is the

---

[2] As an initial mater, the length of any delay in indicting defendant on its face does not appear to warrant dismissal. Although defendant argues that five years passed from the last transaction underlying a substantive bank fraud charge to the date that he was indicted (in December 2012), the indictment charges that the conspiracy to commit wire and bank fraud continued through April 2012. (*See generally* Indictment.)

absence of one potential witness, Neda Imasuen, the lawyer who arranged the transactions underlying the substantive bank fraud charges in the indictment. (*See* Opp. at 5.)

"Faded memories or unavailable witnesses are inherent in any delay, even if justifiable. To merit dismissal a defendant must demonstrate a substantial, actual prejudice to his ability to defend himself." *United States v. Delacruz*, 970 F. Supp. 2d 199, 202 (S.D.N.Y. 2013) (citing *United States v. Long,* 697 F. Supp. 651, 657 (S.D.N.Y. 1988)). Defendant fails to make such a showing, having not demonstrated (1) his efforts to locate the witness and that the witness would have been available had defendant been charged sooner, or (2) that the potential witness would offer any testimony helpful to defendant.

Defendant can only speculate on what evidence was lost as a result of the delay. As the government's opposition motion highlights, it is hardly certain that Mr. Imasuen, an unindicted co-conspirator who executed allegedly fraudulent transactions, would give testimony favorable to defendant. *See United States v. Dinero Express, Inc.*, No. 99-cr-975, 2000 WL 254012, at *4 (S.D.N.Y. Mar. 6, 2000) (no actual prejudice found where defendants did not explain how the witness was rendered unavailable by the pre-indictment delay, how the anticipated testimony would have been beneficial, or whether the witness

would have cooperated with defense counsel in the first instance).

Defendant's contention that the actual prejudice he suffered is the "missed opportunity" to explore whether a witness could offer testimony favorable to his defense is unsupported by the caselaw in this circuit. *See Long*, 697 F. Supp. at 657 (holding that perceived prejudice arising out of a five-year pre-indictment delay was speculative and failed to justify dismissal where defendant did not know what a deceased witness's testimony would have been); *see also U.S. v. Guerra*, No. 10-cr-147, 2012 WL 1899861, at *5 (E.D.N.Y. May 24, 2012). In the same vein, the defense's reliance on *United States v. Santiago*, 987 F. Supp. 2d 465, 488 (S.D.N.Y. 2013) is misplaced, as the missing witness in that case had made statements exonerating the defendant (and contradicting the government's theory of the case) on two prior occasions.[3] Here, defendant has not shown what testimony Mr. Imasuen would offer, and the fact that defendant is "barred from exploring whether the attorney who oversaw all four transactions in the indictment has any

---

[3] Additionally, the court in *Santiago* found that the government had made deliberate decisions to delay processing the case such that forcing the defendant to stand trial would violate fundamental conceptions of justice, fair play, and decency. *Id.* at 496-98.

exculpatory testimony" (Reply at 2.) does not demonstrate that defendant was actually prejudiced by any delay.[4]

Moreover, even if defendant had suffered actual prejudice from the pre-indictment delay, he has not shown that the government delayed filing the indictment in order to obtain a tactical advantage. Defendant asserts that an improper purpose can be inferred because the government had "no conceivably justifiable reason why they would wait over five years" to indict defendant. (Mot. at 6.) Despite arguing that "[t]here is only one inference to draw from this delay absent an explanation otherwise," defendant has not presented any evidence demonstrating that the government intended to, or did in fact, gain any tactical advantage through a deliberate delay.

The government asserts that the timing of the indictment was dictated by the government's investigation into defendant, as it continued to gather evidence until it was "satisfied that [it would] be able promptly to establish guilt beyond a reasonable doubt." (Opp. at 7, citing *United States v. Lovasco*, 431 U.S. 783, 796 (1977).) As the Supreme Court held in *Lovasco*, pre-indictment delay for the purpose of

---

[4] Furthermore, at oral argument on defendant's motion, the parties acknowledged that the same information defendant seeks regarding the four subject transactions could be obtained from the buyers for each transaction. (*See* Tr. of Jan. 9, 2014 Oral Argument ("Oral Arg. Tr.") at 9-13.) While defense counsel asserted that, at the time of argument, the buyers were unwilling to speak to the defense and therefore "unavailable," their testimony ostensibly can be procured through the subpoena process.

investigating a case is permissible, "even if [the] defense might have been somewhat prejudiced by the lapse of time." *Lovasco*, 431 U.S. at 796. Accordingly, because defendant has not satisfied his burden of showing both actual prejudice and intentional strategic delay by the government, his motion to dismiss the indictment on the ground of pre-indictment delay is denied.

## II. Motion to Suppress Evidence Seized from Defendant's Residence

The second issue for the court is whether evidence seized from defendant's residence on December 17, 2012, the day of his arrest, should be suppressed. Defendant argues that suppression is warranted because (1) there was no valid arrest warrant to justify the agents' entry into the residence (*see* Mot. at 6-8), (2) the search warrant contains misrepresentations and false statements of material fact (*see* Mot. at 9-12), and (3) the agents executing the arrest warrant were not lawfully positioned to make the observations described in Agent Trebelhorn's affidavit, and the evidence observed was not in plain view (*see* Mot. at 12-14). The government contends that (1) the typographical date error on the arrest warrant does not affect the validity of either the arrest or search warrants (*see* Opp. at 7-8), (2) the defendant has not satisfied his burden of demonstrating that statements in the affidavit were false or

misleading (*see* Opp. at 11-14), and (3) the agents executing the

arrest were entitled to conduct the protective sweep of the

residence, and any documents in plain view were legally viewed

in the course of the sweep (*see* Opp. at 8-11).  The court held

an evidentiary hearing on the protective sweep[5] on March 3, 2014,

at which FBI Special Agent Jonathan Scott testified for the

government and Lalita Monica Singh, the defendant's ex-wife, and

Fawaz Badoolah, the defendant's 20-year-old son, testified for

the defense.  At the continued hearing on March 26, 2014, Ma

---

[5] Despite defense counsel's repeated efforts to expand it after the fact, the
scope of the evidentiary hearing was limited to whether the materials used in
support of the search warrant were in fact viewed legally or whether the
agents conducted a search prior to Magistrate Judge Levy's authorization — as
set by the court at oral argument on defendant's motion:

> Ms. Russell: Your Honor, just to define the scope.  I believe in
> the government's opposition they've indicated a hearing as it
> relates to the protective sweep, they would have no opposition to
> that.  In that regard, I'm not going to address that issue.

> The Court: All right.  So you would like to schedule a hearing
> with the agents regarding the protective sweep?

> Ms. Russell: Yes, Judge.

(Oral Arg. Tr. at 4; *see also id.* at 42 ("Ms. Russell: I will just
revisit in terms of – at the hearing – whether or not [the agents] were
in a lawful position to make these so-called plain view
observations").)  In its post-hearing submission, the defense asserts
that, at the July 9, 2014 continuation of the hearing, the court
narrowed the previously-defined scope of the hearing to exclude any
testimony regarding the statements made by Agent Trebelhorn in his
affidavit supporting the search warrant.  (*See* ECF No. 54, Post-Hr'g
Mem. of Law in Supp. dated 7/23/14 ("Def.'s Post-Hr'g Mem."), at 1-2).
As the court repeated at the March 3, March 26, and July 9, 2014
hearings, however, the hearing was held to resolve factual issues
regarding the events on the day of defendant's arrest; while defendant
did not merit a *Franks* hearing on the validity of the affidavit
underlying the search warrant, the court would consider the sufficiency
of the affidavit after ruling on the legality of the protective sweep.
(*See* Tr. of Mar. 3, 2014 Evidentiary Hearing ("T1") at 2, 143-44; Tr.
of Mar. 26, 2014 Evidentiary Hearing ("T2") at 5-17; Tr. of July 9,
2014 Evidentiary Hearing ("T3") at 14-20.)

Khalaque, a tenant living in the defendant's basement, and Aleema Ishmile, the defendant's 19-year-old daughter, testified on behalf of the defense, the government continued its cross-examination of Ms. Singh, and Agent Trebelhorn testified for the government.  The hearing was again continued until July 9, 2014, to allow for the appointment of counsel for Ms. Singh before continuing her cross-examination and to hold a *Curcio* hearing regarding defense counsel's continued representation of defendant.  On July 9, 2014, the court concluded the hearing after the cross-examinations of Ms. Singh and Agent Trebelhorn were completed.  Ms. Singh's testimony was subsequently stricken from the record after she asserted her Fifth Amendment privilege against self-incrimination during her cross-examination.  The parties filed post-hearing submissions with the court (*see* ECF No. 53, Post-Hr'g Mem. of Law in Opp. dated 7/22/14 ("Gov't Post-Hr'g Mem."); Def.'s Post-Hr'g Mem.) and responses to their adversary's submission (*see* ECF No. 55, Resp. to Defendant's Post-Hr'g Submission dated 8/5/14 ("Gov't Post-Hr'g Reply"); ECF No. 56, Reply in Supp. of Mot. to Suppress dated 8/11/14 ("Def.'s Post-Hr'g Reply")).

### a. Factual Findings

During the evidentiary hearing, the witnesses for the defense gave sworn testimony that contradicted the version of defendant's arrest given by Agents Scott and Trebelhorn.

### i. Testimony from the Government's Witnesses

According to the credible testimony of Agents Scott and Trebelhorn, defendant was the subject of an FBI investigation into a multimillion dollar mortgage fraud scheme. (T1 at 5; T2 at 82.) On December 17, 2012, Agents Scott and Trebelhorn, along with approximately eight other FBI agents, executed a warrant for defendant's arrest at his residence in Queens, New York. (T1 at 6, 10; T2 at 82-83.) The residence is a three-story single-family house with an adjacent driveway. (T1 at 6; T2 at 82.) Upon the agents' arrival at the house, shortly before 6 a.m., they observed the second-floor lights on and the exit of an unknown man from the basement of the house.[6] (T1 at 9; *see* T2 at 83-84.) Agents approached the front door and knocked loudly while identifying themselves as FBI agents. (T1 at 11, 14; T2 at 84.) While looking through the window on the front door, the agents observed defendant alternately running between various rooms in the house, running up and down the stairs, and assuming a crouching position. (T1 at 13-14; T2 at 85.) As a result of defendant's response to the agents' announcing their presence, Agents Scott and Trebelhorn were concerned that he could be hiding or destroying evidence or

---

[6] The person exiting from the basement side door of the house was later identified as Mr. Khalaque, who lives in the basement of the residence with his wife. (*See generally* T2 at 18-30.)

concealing a weapon or trap for the agents.  (T1 at 13-14; T2 at 85.)

Defendant opened the front door after approximately 5 to 15 minutes, at which time agents led him out of the foyer into an adjoining space at the front of the first floor.[7]  (T1 at 15; T2 at 86.)  After moving defendant out of the path of the front door, the agents placed him on the floor to handcuff him and take him into custody.  (T1 at 16-17.)

After the defendant was placed into custody, agents began a sweep of the first floor, including the bedrooms, and commanded the family members present in the house to come to the first floor.  (T1 at 18, 20; T2 at 86-88.)  The other occupants descended from the upper floor one at a time and provided the agents with inconsistent information regarding the number of people present in the house, prompting the agents to proceed to conduct a safety sweep of the other floors of the house.  (T1 at 20-21; T2 at 88.)  While the family members were congregated on the first floor and agents conducted their sweep of the first floor, the agents observed documentary evidence with the names of straw buyers and front companies known to the agents to be

---

[7] The first floor of the house is generally one open space, with partial walls separating the front and back areas and two small bedrooms that open off of the kitchen at the back of the floor.  (*See* T1 at 15-16; T2 at 89.)

involved in the alleged mortgage fraud scheme.[8]  (T1 at 23-30; T2
at 90.)  Agent Scott proceeded to take photographs of items that
the agents observed in plain view.  (T1 at 23-24, 32.)  The
agents secured the perimeter of the house in advance of their
application for a search warrant.  (T1 at 31; T2 at 83.)

In advance of transporting defendant for his
arraignment, agents asked defendant for an identification
document.  (T1 at 75-76.)  Defendant pointed the agents to a
jacket in or around a closet where they could find a form of
identification, and the agents retrieved his New York State
identification.  (T1 at 75-76.)  Agent Trebelhorn did not recall
whether a driver's license had been obtained, but recalled
having one of defendant's passports at the time he was
transported.  (T3 at 59.)  While transporting defendant, Agent
Trebelhorn emailed Agent Scott, who remained at defendant's
residence, to ask whether the agents at the residence had found
one of defendant's passports.  (*See* T1 at 75-76; T2 at 108-109.)
Agent Trebelhorn explained that he learned about a second
passport during the transport and asked defendant for its
location; upon learning the location from defendant, Agent
Trebelhorn relayed the information to Agent Scott.  (T2 at 108-

---

[8] The agents also testified to the investigative steps they had taken to
determine that defendant was connected to the entities and names listed on
the documents and folders in plain view.  (T1 at 25-31.)

109.) The agents at the house never located a passport. (T1 at 76-77.)

A search warrant was granted later the same day, at which time the agents began their search of the premises and took photographs to memorialize the setting before and after the search. (T1 at 32, 35-36.) The agents credibly testified that they did not conduct a search of the residence prior to receiving judicial authorization. (T1 at 34-35; T2 at 90-91.)

### ii. Testimony from the Defense Witnesses

Defendant's neighbor and family members offered testimony regarding the arrest that contradicted the account from Agents Scott and Trebelhorn. Defendant's son, Fawaz Badoolah, testified that, while defendant was handcuffed, the agents were going through cabinets and drawers and had files "all over." (T1 at 121.) He also testified that agents took files from the first-floor work area, including from the radiator, back to the bedroom where defendant was being held by other agents. (*Id*. at 121-22.)

Mr. Khalaque testified that he was detained by agents after leaving the house on the morning of defendant's arrest. (T2 at 20.) Agents later brought him into the room where defendant was being held, at which time Mr. Khalaque observed agents checking the pockets of defendant's coat hanging outside

a closet.  (*Id.* at 23-25.)  He did not notice any documents in the agents' hands.  (*Id.* at 24.)

Defendant's daughter, Ms. Ishmile, testified that she saw agents searching cabinets and drawers while she was sitting on the first floor with her family.  (*Id.* at 34.)  She further testified that she observed an officer take files from a drawer into the room where defendant was being held.  (*Id.* at 34-36.)

### b. Application

#### i. The Arrest Warrant

As a preliminary matter, the court notes that defendant was arrested pursuant to a valid arrest warrant.  The typographical error listing the year on the warrant as 2002 instead of 2012 did not render the warrant facially invalid. *See United States v. Waker*, 534 F.3d 168, 171 (2d Cir. 2008). Furthermore, the executed warrant indicates that it was procured on December 14, 2012 and executed on December 17, 2012.  (Opp. Ex. A.)  Defendant's allegations to the contrary border on the frivolous, especially given that Magistrate Judge Scanlon was not a judge in 2002.[9]  While the defense has argued that their inability to locate the warrant through the office of the clerk of this court or Judge Scanlon's chambers indicates that no

_____

[9] Defense counsel's suggestion that Judge Scanlon's signature was forged on at least one copy of the arrest warrant is similarly irresponsible.  (*See* Oral Arg. Tr. at 24-25.)

warrant exists, the executed arrest warrant conclusively establishes otherwise.

### ii. The Search Warrant

As an initial matter, the court finds that Agent Scott and Agent Trebelhorn's accounts of the arrest and subsequent protective sweep were credible. Although defendant identifies facts and discrepancies from the agents' testimony that he believes indicate that a warrantless search was conducted (*see* Def.'s Post-Hr'g Reply at 5), the court finds that the facts identified do not cast doubt on the agents' reliability or candor. In contrast, the court notes that the hearing testimony from defendants' children did not appear credible. Ms. Ishmile's testimony that the agents searched through drawers and cabinets did not appear in the affidavit she submitted in connection with defendant's motion to suppress. (*See* T2 at 38-44; Reply Ex. 4.) Defendant's son offered a similar account of agents rifling through drawers and cabinets, in direct contrast with the agents' testimony and unsupported by any other evidence from the day of the arrest.

> **1. The agents were entitled to conduct a protective sweep of the first floor and, thus, were lawfully-positioned to make the plain view observations underlying the search warrant affidavit.**

The parties do not dispute that agents were legally present at defendant's residence for the execution of the arrest

warrant, but dispute the legality of the protective sweep conducted by agents following defendant's arrest.  Defendant argues that neither defendant's delay in opening the door nor the agents' uncertainty about the number of people present at the residence could provide the articulable basis necessary to justify a protective sweep of the residence.  The government contends that, under *Maryland v. Buie*, 393 U.S. 325 (1990), the agents were authorized to conduct a protective sweep of the rooms immediately adjoining the arrest site.

Agents executing an arrest may conduct a protective sweep of the arrest site, including any space "immediately adjoining the place of arrest from which an attack could be immediately launched," "as a precautionary matter and without probable cause or reasonable suspicion.  *Buie*, 393 U.S. at 334; *see also United States v. Lauter*, 57 F.3d 212, 216 (2d Cir. 1995).  To conduct a more extensive sweep, however, agents must have articulable facts which would lead them to reasonably suspect that the area to be swept harbors an individual posing a threat.  *Id.*  The protective sweep may "extend only to a cursory inspection of those spaces where a person may be found," and may last no longer than "is necessary to dispel the reasonable suspicion of danger . . . ."  *Id.* at 335.

In this case, the agents conducted a protective sweep of the areas immediately adjacent to the place of arrest.  As

the agents and defendant's daughter testified (*see* T1 at 43), the layout of the first floor of the residence, where defendant was arrested, is largely an open space with only partial walls between each area. The agents conducted a sweep of the first-floor open area after moving defendant away from the foyer and handcuffing him, at which time they observed various documents in plain view, as discussed below. The central work area opened directly onto the front room where defendant was arrested, and thus was a space "immediately adjoining the place of arrest from which an attack could be immediately launched" within the meaning of *Buie*. Accordingly, the agents' protective sweep of the open first-floor area was justified.[10]

Defendant also argues that the government has not established specific and articulable facts to justify the agents' sweep of the basement and the upper floors of the residence. (Def's Post-Hr'g Mem. at 4.) First, it does not appear that the agents made any observations in their sweep of the other floors that could or did support their request for a search warrant; accordingly, this prospective sweep does not implicate defendant's motion to suppress. Regardless, the court finds that the agents were warranted in their suspicion that the upper and lower floors might harbor an individual who would

---

[10] The court does not accept defendant's argument that the agents' alleged failure to include the bathroom in their security sweep somehow undermines the justification for the sweep.

threaten their safety.  Agents Scott and Trebelhorn both testified to defendant's delay in opening the front door, their observation of him running between rooms and crouching down during this delay, leading them to suspect that defendant could be setting a trap for the agents.[11]  Furthermore, Agent Trebelhorn testified that as each family member appeared individually at the top of the stairs leading down to the main florr, different family members gave him conflicting information regarding the number of individuals present in the house.

Defendant cites the Second Circuit's decision in *United States v. Gandia*, 424 F.3d 255, 264 (2d Cir. 2005), for the proposition that "lack of information as to the existence in a residence of third parties cannot provide an articulable basis upon which to justify a protective sweep."  (Def.'s Post Hr'g Mem. at 4.)  In *Gandia*, the Second Circuit specifically noted that the government had failed to identify anything in the record from which a reasonable officer could have suspected a "specific danger of unknown third-parties hiding in [the defendant's] apartment."  *Gandia*, 424 F.3d at 264.  In this case, however, the agents testified that they were provided with inconsistent information about the number of occupants in the

---

[11] The agents also testified that they became concerned that defendant could be destroying evidence during prior to opening the door.  Because the sweep was justified for other reasons, the court does not address whether any part of the agents' sweep was justified by the agents' suspicion that evidence was being destroyed.

house, and that the discrepancy between the numbers reported suggested precisely that unknown third-parties may have been present. In response, the agents conducted a two to five minute sweep of the upper and lower floors to ensure they were clear of other occupants and did not seize any evidence in the process. Such a sweep does not contravene the holdings of *Buie* or *Gandia*.

### 2. The agents did not conduct a search of the premises prior to receiving judicial authorization.

Having concluded that the protective sweep by the agents was lawful, the court next turns to the question of whether the evidence cited in Agent Trebelhorn's affidavit was actually in plain view or was obtained as the result of an unlawful search of the premises. In its post-hearing submissions, the defense argues that (1) the position of and marks on various documents in the agents' photographs of the first floor and (2) discrepancies between Agent Trebelhorn's testimony and the property receipts from the day of the arrest establish that the agents conducted an unauthorized search prior to Judge Levy's issuance of the search warrant.[12]  (Def.'s Post-Hr'g Mem. at 7-10.)

A warrantless search and seizure is "*per se* unreasonable under the Fourth Amendment—subject only to a few

---

[12] Defendant also argues that an email conversation between Agent Scott and Agent Trebelhorn regarding the location of defendant's second passport implies that the agents conducted an unauthorized search. (Def.'s Post-Hr'g Mem. at 10.)

specifically established and well-delineated exceptions."
*United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999)
(quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)) (internal
citations and quotation marks omitted).  Pursuant to the "plain
view" exception, "if police are lawfully in a position from
which they view an object, if its incriminating character is
immediately apparent, and if the officers have a lawful right of
access to the object, they may seize it without a warrant."
*Kiyuyung*, 171 F.3d at 83 (quoting *Minnesota v. Dickerson,* 508
U.S. 366, 375 (1993)) (internal quotation marks omitted).

Both Agent Scott and Agent Trebelhorn credibly
testified that the names on the documents and folders were
legible from their vantage point and that the agents did not
search through cabinets or drawers prior to Judge Levy's
issuance of a search warrant.  Defendant argues, based on the
photographs taken by the agents and defense counsel's cross-
examination of the agents, that the visibility of certain detail
in some photos but not others, as well as alleged differences in
the position of documents and folders in certain photos,
indicate that the agents conducted an unlawful search.  As noted
by the court at the evidentiary hearing, however, the degree of
detail in the documents, about which defense counsel questioned
the agents in support of defendant's position, is not visible
from the photographs.  (*See* T1 at 62.)  Thus, any minor

differences between photographs cannot alone support a finding that the agents conducted an illegal search.

Defendant's suggested inference that the timestamps on the photographs indicate that an unauthorized search occurred is similarly unsubstantiated; the court cannot conclude from a 26-minute delay between photographs that agents were conducting an unauthorized search in the interim.  The court also finds that the discrepancy between Agent Scott's testimony and the property receipt for the central work area—whether folders were located on a table near the radiator or on the radiator, which was near a table—does not negate the agents' credibility, particularly given that neither testifying agent created the property receipt.

Furthermore, to the extent that the folders on the desk or radiator may have been moved or taken to the back room where defendant was being held, the court notes that the agents were entitled to seize (and therefore move) incriminating evidence that they observed in plain view.  *See United States v. James*, 415 F. Supp. 2d 132, 150 (E.D.N.Y. 2006) *aff'd*, 712 F.3d 79 (2d Cir. 2013) (internal citations omitted) ("Upon recognizing the stack to contain insurance policies subject to search in plain view, there would have been nothing wrong with the detective touching them or even picking them up to take them into the kitchen."); *see also United States v. Gomez*, 652 F.

Supp. 461, 463 (E.D.N.Y. 1987) (noting that it is well-established that "seizure of documents as in 'plain view' is not improper . . . notwithstanding the fact that some perusal is needed for the seizing agents to perceive the relevance of the documents to the crime.") (internal citations omitted).

Defendant also argues that the email chain between Agents Scott and Trebelhorn during defendant's transport from the residence indicates that an unauthorized search, for defendant's passport or other evidence, took place. Both agents testified that defendant gave his consent for agents to retrieve identification documents from a jacket hanging near a closet in advance of his transport for processing. In the absence of any other evidence in the record, the court rejects defendant's argument that Agent Trebelhorn's asking Agent Scott whether a passport had been found requires an inference that the agents were conducting an unauthorized search of any kind.

In sum, the court finds that the agents were lawfully present in the first floor of the residence, the files and folders were observed in plain view and the incriminating nature of the files[13] was immediately apparent to them as a result of their investigation into defendant's activities and knowledge of the alleged mortgage fraud scheme. Accordingly, no violation of defendant's Fourth Amendment rights occurred and defendant's

---

[13] Defendant's argument that the documents were not in fact incriminating is considered below in the context of Agent Trebelhorn's affidavit.

motion to suppress the evidence based on an illegal warrantless search is denied.

### 3. Magistrate Judge Levy was not knowingly or recklessly misled by Agent Trebelhorn's affidavit.

Alternatively, defendant argues that the evidence from the search should be suppressed because Agent Trebelhorn's affidavit contains misrepresentations of facts involving a cooperating witness (the "CW") and confidential source (the "CS") and, excluding those allegedly false facts, Judge Levy did not have probable cause to issue a search warrant.[14]  (*See* Mot. at 9-12.)  The government argues that defendant has failed to carry his burden of demonstrating that a statement in the affidavit is intentionally false.  (Opp. at 11.)

---

[14] Defendant also argues that (1) the affidavit is, as a whole, lacking factual support and (2) the materials observed in plain view that are cited in the affidavit are not evidence of criminal activity and therefore cannot sustain a finding of probable cause.  (Mot. at 14-17.)  As to (1), Agent Trebelhorn expressly states in his supporting affidavit that his "knowledge of the information set forth in this affidavit is based upon [his] personal participation in this investigation and his "review of records and reports," "debriefing of cooperating witnesses," " discussions with witnesses and victims," and "conversations with and review of information provided by financial institutions," among other things.  (Trebelhorn Aff. ¶ 3.)  As to (2), as previously noted (*see* Oral Arg. Tr. at 40-41), the agents have conducted an ongoing investigation into the charged mortgage fraud scheme and, thus, became familiar with the alleged straw buyers, straw companies, and addresses that they saw on documents in defendant's house on the day of his arrest.  "[U]nder the plain view doctrine, the incriminating nature of an object is generally deemed 'readily apparent' where law enforcement have reason to believe it is or contains evidence of a crime."  *See United States v. Delva*, -- F. Supp. 2d --, No. 12 CR. 802, 2014 WL 1378770, at * (S.D.N.Y. Mar. 11, 2014) (citing *United States v. Ochs*, 595 F.2d 1247, 1258 (2d Cir. 1979)).  Agent Trebelhorn's affidavit establishes the basis for his knowledge of the names observed on files at the residence; thus, defendant's contentions as to whether the alleged activities were in fact fraudulent are not grounds to find the warrant invalid.

An affidavit supporting a search warrant is
presumptively valid.  *Franks v. Delaware*, 438 U.S. 154, 171
(1978).  In order to merit a hearing regarding the validity of
an affidavit, the defendant must make a substantial preliminary
showing that (i) the warrant affidavit contains a false
statement or material omission that makes the affidavit
misleading; (ii) the false statement or material omission was
the result of the affiant's deliberate falsehood or reckless
disregard for the truth; and (iii) the false statement or
material omission was integral or necessary to the magistrate
judge's probable cause finding.  *United States v. Martin,* 426
F.3d 68, 73-74 (2d Cir. 2005).

Defendant argues that two particular statements in the
affidavit are false.  The first statement reads:

> [At the SUBJECT PREMISES], BADOOLAH presented the CW
> with a letter already bearing a notary stamp and asked
> the CW to sign the letter.  According to the CW, the
> letter, which contained false information, was to be
> submitted to a Lender in furtherance of the mortgage
> fraud scheme described above.

(Trebelhorn Aff. ¶ 11.)  In his motion and at oral argument,
defendant argues that the CW did not improperly notarize the
letter in question, as indicated by the affidavit.  (Mot. at 9-
10; Oral Arg. Tr. at 37-39.)  Defendant also contends that the
letter referenced in the affidavit (Mot. Ex. E) does not contain
any false information and is not evidence of mortgage fraud.

(Mot. at 10.)  The second statement that defendant claims to be false provides:

> The CS has visited BADOOLAH on multiple occasions at
> the SUBJECT PREMISES where BADOOLAH resides.  During
> these visits, the CS has witnessed BADOOLAH and other
> co-conspirators in the mortgage fraud scheme preparing
> documents in furtherance of the mortgage fraud scheme
> described above.

(Trebelhorn Aff. ¶ 13.)  Defendant argues that it is "highly unlikely" that the CS made such observations because defendant only occupied the residence for a limited period in early 2012, and the four transactions underlying the substantive bank fraud charges occurred in 2008 and 2009.[15]  (Reply at 4-5; *see also* Oral Arg. Tr. at 30-31.)  Finally, defendant claims that Agent Trebelhorn's statement that "straw buyers" did not intend to inhabit or control the properties is a reckless misrepresentation lacking factual support, because the agent never conversed with the buyers and the buyers did in fact intend to control the properties.  (Mot. at 11.)

As an initial matter, defendant has not made a sufficient showing regarding the falsity of statements material to the magistrate judge's probable cause finding.  In his motion, defendant alleges that the substance of the information

---

[15] In its opening motion, defendant argued that this statement is false because, in a recorded conversation between the CW (since identified as Carl Bennett) and a man that defendant believes to be the CS (Arturo Giraldo), Mr. Giraldo says that he never went to South Ozone, Queens to visit defendant; the government stated in its opposition papers, however, that defendant's speculation regarding the identity of the CS was incorrect.  (Mot. at 10-11; Opp. at 14.)

provided by the government's sources is not true.  As the court
has previously noted, the affidavit accurately states that
defendant lives at the subject premises, as he did at the time
of the arrest.  (*See* Oral Arg. Tr. at 32.)  Whether defendant
lived at the subject premises or merely worked there at the time
of the CS's alleged conversations with him is not material to
the magistrate judge's probable cause determination as to
whether evidence of criminality was located in the subject
premises.

Similarly, the affidavit stated that, according to the
CW, the notarized letter contained false information and was to
be submitted to a lender in furtherance of the scheme, and that
defendant regularly received fraudulent documents in furtherance
of the scheme.  Thus, whether or not the CW falsely notarized
the particular letter is not material to the magistrate judge's
probable cause determination.  Furthermore, defendant's
contention that the writer of the letter testified under oath to
signing the letter does not indicate that its contents are true,
thereby rendering the CW's statement false.  (*See* Oral Arg. Tr.
at 16-17.)  Neither do documents that the defense asserts "tend
to show true ownership" of properties by two straw buyers (*see*
Reply at 6) suggest that Agent Trebelhorn's description of the
mortgage fraud scheme is wholly false.

More importantly, although defendant disputes the substance of the information provided by the government's sources, he makes no showing that Agent Trebelhorn knowingly, intentionally, or recklessly included the statements in his affidavit. "As a general rule," if an informant made a false statement to an affiant, "that does not present grounds to challenge the search warrant so long as the affiant in good faith accurately represents what the informant told him." *United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995). Defendant has not alleged that Agent Trebelhorn did not in good faith accurately represent what he was told by the two sources. *See United States v. Taylor*, 672 F. Supp. 2d 539, 541-42 (S.D.N.Y. 2009) ("[the defendant] cannot merely assert that the information provided by [the source] was false but instead must make a substantial showing that [the affiant] himself acted recklessly by including [the source's] information in the affidavit").

Defendant instead argues that Agent Trebelhorn was reckless in including the statement from the CS because the CS's observation is not specific enough and the CS would "stand[] to benefit from any kind of information he/she manages to concoct against Mr. Badoolah." (Reply at 5-6.) In support of this argument, defendant cites to affidavits that Agent Trebelhorn has submitted in other, unrelated cases, which defendant

contends are more specific than the one submitted in support of the instant search warrant. (*See id.*)

Defendant's arguments are misguided. Although defendant will be able to challenge the sufficiency of the government's evidence in proving its case against him at trial, his summary denials of criminal conduct and accusations of lying are insufficient for this court to find that Agent Trebelhorn knowingly or recklessly misled the magistrate judge with the disputed statements in his affidavit. The affidavit states that information from the government's sources has, to date, "proved reliable and has been corroborated by, among other evidence, documents obtained from the Lenders reflecting BADOOLAH's fraud and statements by other witnesses." (Trebelhorn Aff. ¶ 10.) Thus, as the court found at oral argument, defendant has not met his substantial burden under *Franks* and is not entitled to a hearing.

"[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit [applying for a warrant] should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates,* 462 U.S. 213, 236 (1983)). Because (1) the evidence from defendant's residence was lawfully seized pursuant to the plain view exception and (2) defendant

has not sufficiently demonstrated that Agent Trebelhorn made knowingly or recklessly false statements in his affidavit, the court finds no reason to conclude that Judge Levy lacked an adequate basis to find probable cause to issue the search warrant.

Thus, for the reasons stated above, defendant's motion to suppress the evidence seized from his home on December 17, 2012 is denied in its entirety.

## III. Motion to Dismiss the Indictment for Vagueness or, in the Alternative, for a Bill of Particulars

Defendant moves the court to dismiss the indictment or, in the alternative, for a bill of particulars with respect to the conspiracy charge (Count One) on the grounds that the indictment is impermissibly vague. He argues that the indictment charges conspiracy to commit bank and wire fraud but does not name any other individuals alleged to be involved in the conspiracy and does little more than recite the elements of the crime. (Mot. at 17-18.) The particulars sought by defendant can be grouped into four general categories: (1) the identities of unindicted co-conspirators, (2) the point at which each alleged co-conspirator joined the conspiracy, (3) the dates, times, and places of alleged conspiratorial acts, and (4) all overt acts not identified in the indictment. (*Id.* at 19.) The government notes that it has already provided defendant with

sufficient information regarding each substantive bank fraud count through the indictment and other discovery materials. (Opp. at 15.)  Because the court finds that the indictment and other disclosures by the government have been sufficient to inform defendant of the charges against him, the court denies defendant's motion to dismiss the indictment and for a bill of particulars regarding Count One of the indictment.

### a. Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) requires that an indictment to be "a plain, concise and definite written statement of the essential facts constituting the offense charged."  The indictment must "contain[] the elements of the offense charged and fairly inform[] a defendant of the charge against which he must defend" and "enable[] [the defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Stringer,* 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The Second Circuit has consistently found sufficient indictments that "do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *United States v. Kazarian*, No. 10 CR. 895, 2012 WL 1810214, at *24 (S.D.N.Y. May 18, 2012) (quoting *United States v. Stavroulakis,* 952 F.2d 686, 693 (2d Cir. 1992)).  If an indictment tracks the language of

the statute, however, the statutory language must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *Hamling*, 418 U.S. at 117.

Federal Rule of Criminal Procedure 7(f) allows a defendant to seek a bill of particulars in order to (1) "identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial"; (2) "to prevent surprise"; and (3) "to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). The determination of whether a bill of particulars is warranted is in the discretion of the district court and turns on "whether the information sought is necessary, not whether it is helpful." *United States v. Perryman*, 881 F. Supp. 2d 427, 430 (E.D.N.Y. 2012) (internal citations omitted). It is well-established in this circuit that a bill of particulars should not be used as a "discovery device" or a "general investigative tool for the defense." *Id.* at 430-31; *see also United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).

A defendant's request for a bill of particulars may be denied "if the information sought by defendant is provided in

the indictment or in some acceptable alternate form," such as

discovery.  *Bortnovsky*, 820 F.2d at 574.  "[O]nly where the

charges of the indictment are so general that they do not advise

the defendant of the specific acts of which he is accused" is a

bill of particulars required.  *Perryman*, 881 F. Supp. 2d at 430

(quoting *Torres*, 901 F.2d at 234).

### b. Application

Defendant faces charges of substantive bank fraud and

conspiracy to commit bank and wire fraud.  He argues that the

indictment should be dismissed because it does not give him

adequate notice of the charges against him, particularly the

conspiracy charge.  (Mot. at 17-18.)

Defendant concedes that the indictment tracks the

statutory elements of conspiracy and does not claim that it

fails to allege every element of the charged offense.  (*See* Mot.

at 18.)  Although defendant argues that "[t]he charge fails to

provide the defendant with notice of the particular manner and

means by which this 'conspiracy' was supposed to operate," among

other things, Count One of the indictment incorporates by

express reference paragraphs 1-36 of the indictment, which

include a description of the alleged fraudulent scheme.

In *United States v. Kazarian*, 2012 WL 1810214, at *24,

the district court denied a defendant's motion to dismiss the

indictment for failure to provide adequate notice of the

charges, which included conspiracy to commit health care fraud,
bank fraud, money laundering, and access device fraud.  The
district court determined that the indictment included all
necessary detail by tracking the relevant statutory language and
alleging the essential elements of the charged offenses.  *Id.*
Here, the court similarly disagrees with defendant's contention
that he is entitled to more information than the indictment
provides and finds that the indictment satisfies the
requirements of Federal Rule of Criminal Procedure 7(c).
Accordingly, defendant's motion to dismiss the indictment for
vagueness is denied.

In the alternative, defendant moves for a bill of
particulars with respect to Count One detailing (1) the
identities of unnamed co-conspirators, (2) the point at which
each alleged co-conspirator joined the conspiracy, as well as
the factual basis for the alleged duration of the conspiracy,
(3) the dates, times, and places of any alleged conspiratorial
acts, and (4) all overt acts not identified in the indictment
(or, at minimum, those in which defendant allegedly
participated).  (Mot. at 19.)

Having reviewed the indictment, Agent Trebelhorn's
affidavit in support of the search warrant, a letter from the
government to Magistrate Judge Levy requesting entry of a
permanent order of detention, and the letters that have

accompanied the government's discovery disclosures to date (*see* ECF Nos. 1, 14, 15, 18, 20, 26-27, 32 Ex. C), the court respectfully denies defendant's motion for a bill of particulars.  The court recognizes that "[a] bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory."  *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003)

The court finds that defendant's specific requests for information fall beyond the scope of a bill of particulars.  *See Torres*, 901 F.2d at 233-34 (affirming denial of motion for bill of particulars where defendant sought date he joined conspiracy, identity of co-conspirators, and precise dates and locations of his overt acts); *United States v. Matos-Peralta,* 691 F. Supp. 780, 791 (S.D.N.Y. 1988) (finding courts "consistently reject[ ] demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant" because "the government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme").

The indictment filed in this case describes the fraudulent scheme and specifies defendant's alleged role in the

scheme, as well as details regarding the properties implicated in the bank fraud charges, including their addresses and the dates and locations of the closings on the properties. In addition, the indictment lists the lenders that the conspirators are alleged to have defrauded.

The government agents' arrest and search warrant affidavits further detail the agents' knowledge of the alleged fraudulent scheme and provide information regarding defendant's activities from two co-conspirators who are currently cooperating with the government. The search warrant affidavit of Agent Treblehorn describes the agents' plain view observations and specifies that documents viewed in the vicinity of defendant's desk contained names of companies and individuals believed to be straw companies and buyers involved in the alleged bank and wire fraud. Furthermore, the government's discovery disclosures provided defendant with a host of other information relating to the charges, including but not limited to bank statements for a number of individuals and corporate entities, dates of monitored recordings with the defendant, mortgage records and loan files for specific properties, cell phone records for identified phone numbers, identification documents and tax returns for named individuals, a wire transfer request from defendant, and contracts from several home sales.

Defendant cites to one District of Columbia decision for support of his requests for the dates on which alleged conspirators joined the charged conspiracy and overt acts in which he participated. (Mot. at 18-19 (citing *United States v. Ramirez*, 54 F. Supp. 2d 25 (D.D.C. 1999)).) The caselaw in this circuit is clear, however, that a district court's denial of a bill of particulars for the names of unindicted co-conspirators is not an abuse of discretion, and district courts routinely deny requests for the type of information requested by defendant with respect to conspiracy charges.[16] *See, e.g.*, *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006) (denying defendant's request for overt acts, dates, locations, and identities of participants relating to racketeering conspiracy charges and noting that "[a]s a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars") (citing *United States v. Feola,* 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987), *aff'd,* 875 F.2d 857 (2d Cir. 1989)); *see also United States v. Mahaffy*, 446 F. Supp. 2d 115, 120 (E.D.N.Y. 2006); *United States v. Coffey*, 361 F. Supp. 2d 102, 122 (E.D.N.Y. 2005).

---

[16] Furthermore, the district court in *Ramirez* emphasized that a bill of particulars was warranted due to the specific circumstances of the case—specifically, that it involved a narcotics conspiracy and the only charged criminal conduct spanned a period of six days in the alleged one-year conspiracy period. *See Ramirez*, 54 F. Supp. 2d at 30.

Thus, for the reasons stated above, the court is satisfied that the government has discharged its burden to provide defendant with sufficient notice of the charges against him to ensure that he may adequately prepare for trial. Accordingly, defendant's motion for a bill of particulars is denied in its entirety.

## IV. Motion for Immediate Disclosure of *Brady/Giglio* Material

Defendant moves for court for an order compelling the government to timely disclose all (1) exculpatory material in its possession that falls within the scope of *Brady v. Maryland*, 373 U.S. 83 (1963) and (2) impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972). (Mot. at 20.) The government responds that defendant's motion for *Brady* materials is moot because the government is unaware of any *Brady* information at this juncture and will immediately produce such material if it becomes aware of any, and defendant's motion for early disclosure of *Giglio* materials is obviated by the government's standard practice of producing such materials in advance of trial along with Jencks Act materials (see below). (Opp. at 20-21.)

### a. Legal Standard

"Under *Brady* and its progeny, 'the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to

punishment.'" *United States v. Certified Environmental Services, Inc.*, 753 F.3d 72, 91 (2d Cir. 2014) (quoting *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001)). "Favorable evidence" that must be disclosed for purposes of *Brady* "includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness," also known as "*Giglio* material." *Id.* "[A] prosecutor must disclose evidence if, without such disclosure, a reasonable probability will exist that the outcome of a trial in which the evidence had been disclosed would have been different." *Coppa*, 267 F.3d at 142.

The government must disclose all *Brady* and *Giglio* material "in time for its effective use at trial." *Id.* The required timing of such a disclosure depends on the materiality of the evidence and the particular circumstances of each case; accordingly, the Second Circuit has refrained from defining the phrase "in time for effective use." *United States v. Taylor*, -- F. Supp. 2d --, No. 10-CR-268, 2014 WL 1653194, at *10 (E.D.N.Y. Apr. 24, 2014). A defendant has "no pre-trial discovery right to *Giglio* materials." *United States v. RW Prof'l Leasing Servs. Corp.*, 317 F. Supp. 2d 167, 179 (E.D.N.Y. 2004) (citing *United States v. Nixon,* 418 U.S. 683, 701 (1974)). "A district court has the discretion to order *Brady/Giglio*

disclosure at any time as a matter of sound case management."
*Taylor*, 2014 WL 1653194, at *10 (internal citation omitted).

### b. Application

In its opposition memorandum and the discovery letters
filed in this case, the government has represented to the court
and defendant that it is aware of its obligations under *Brady*,
that it is unaware of any *Brady* material in its possession, and
that it will immediately produce such material if it becomes
aware that such material exists.  (*See* Opp. at 20; ECF No. 14,
Letter Regarding Discovery dated 1/8/13, at 3.)  Because
defendant has not given the court reason to believe that the
government is not in compliance with its *Brady* obligations, the
court denies defendant's motion to compel under *Brady*.  *RW
Prof'l Leasing Servs*., 317 F. Supp. 2d at 179.

Additionally, the government plans to "adhere to its
customary practice of producing any [*Giglio*] material at the
same time it produces Jencks Act material," one week before
trial.  (Opp. at 18, 21.)  Defendant has not demonstrated any
reason to deviate from the government's standard practice.  The
cases defendant cites in support of immediate disclosure of
*Giglio* material are inapposite; while the government is required
to provide impeachment material to the defense, the timing of
such a disclosure is within the discretion of the district
court, as discussed above.  Thus, as there is no pre-trial right

to *Giglio* material and the government has represented that it
will produce such material in advance of trial, the court denies
the motion for immediate disclosure of *Giglio* material.

## V.    Motion for Immediate Production of Jencks material

Defendant also moves for an order compelling the
government to disclose material pursuant to the Jencks Act, 18
U.S.C. § 3500, immediately. (Mot. at 33-34.)  The government
opposes defendant's motion, contending that the Jencks Act
itself prohibits the court from compelling its early disclosure
of material pursuant to the statute. (Opp. at 18.)

The Jencks Act provides in relevant part that:

> In any criminal prosecution brought by the United States,
> no statement or report in the possession of the United
> States which was made by a Government witness or
> prospective Government witness (other than the defendant)
> shall be the subject of subpoena, discovery, or inspection
> until said witness has testified on direct examination in
> the trial of the case.

18 U.S.C. § 3500(a).  The Second Circuit has repeatedly held
that district courts may not order the pretrial disclosure of
witness statements pursuant to the terms of the Jencks Act.[17]
*See generally Coppa*, 267 F.3d at 145-146 (finding district court
exceeded its authority in ordering pre-trial disclosure of

---

[17] Defendant argues that the court has the authority to override the timing
restrictions set forth in the Jencks Act and Federal Rule of Criminal
Procedure 26.2 (which applies the substance of the Jencks Act to all
witnesses, including defense witnesses) under the Fifth and Sixth Amendments
and its inherent supervisory powers.  The court finds that pretrial
disclosure of witness statements is not required by the Jencks Act, Rule 26.2
or the Constitution, and denies defendant's request.

Jencks material because the Jencks Act constrained the court's power to issue any such order). In any event, the government indicates that it intends to adhere to its custom of producing Jencks material one week before trial. Accordingly, defendant's motion for early disclosure of Jencks Act material, as well as prior statements of co-conspirators, is denied.[18]

## VI.  Motion to compel immediate identification of informants and cooperating witnesses

Defendant moves for the disclosure of the government's confidential informants and cooperating witnesses in advance of trial.[19]  (Mot. at 32.)  The government argues that defendant's motion should be denied because he has failed to allege a particularized need for such disclosure, as required in this Circuit.  (Opp. at 17-18.)

### a. Legal standard

The government may "withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law."  *Roviaro v. United States*, 353 U.S. 53, 59 (1957)).  Although the government

_____

[18] Defendant's motion also demands the disclosure of information relating to "a federal Agent Adrian Busby," who was arrested and convicted for improper conduct and "was directly involved in the investigation of the mortgage fraud scheme involving Arturo Giraldo."  (Mot. at 34.)  Due to defendant's failure to show any connection between his request and this case, and the government's confirmation that Mr. Giraldo is not the CS in the search warrant affidavit (*see* Opp. at 14), the court denies defendant's request.

[19] As discussed above in the context of defendant's motion for a bill of particulars, defendant's request to compel the identification of any unindicted co-conspirators is denied.

has a strong interest in protecting the anonymity of informants, the "fundamental requirements of fairness" require disclosure "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause." *Id.* at 60-61. The district court must weigh "the public interest in protecting the flow of information against the individual's right to prepare his defense." *United States v. Tavarez*, 518 F. Supp. 2d 600, 604 (S.D.N.Y. 2007) (quoting *Roviaro*, 353 U.S. at 62).

"The defendant bears the burden of showing the need for disclosure of an informant's identity" and must show that he or she will be deprived of his or her right to a fair trial absent such disclosure. *United States v. Fields*, 113 F.3d 313, 324 (2d Cir. 1997) (internal citations omitted). A defendant cannot discharge his or her burden by merely speculating "that disclosure of the informant's identity will be of assistance." *Id.* In order for disclosure to be warranted, the defendant must demonstrate that the informant's testimony is material to the defense. *Tavarez*, 518 F. Supp. 2d at 605 (quoting *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir. 1988)).

### b. Application

In his motion, defendant states that disclosure of "the names, addresses and present locations of each and every

informant and cooperating witness" is necessary for his defense

of this case.  (Mot. at 32.)  Such broad allegations do not,

absent more, demonstrate sufficient need to compel the

disclosure of information regarding the government's informants

and cooperating witnesses.  *See Tavarez*, 518 F. Supp. 2d at 605

(denying motion to disclose informant's identity where defendant

claimed only that "information attributed to the confidential

source may well have been relied on as a basis for arresting

[the defendant]").  Therefore, defendant's motion to disclose

confidential informants and cooperating witnesses is denied.[20]

## VII.  Motion for Leave to File Additional Motions

Defendant reserves his right to file additional

motions if necessary.  (Mot. at 35.)  Following the July 9, 2014

continuation of the evidentiary hearing, and in response to

defense counsel's interest in filing, *inter alia*, a motion to

suppress defendant's post-arrest statements, the court ordered

that defendant file any additional motions by July 30, 2014.

---

[20] To the extent that the defense separately requests immediate production of
the government's full witness list, that request is also denied.  Generally,
a defendant is not entitled to the identification of the government's
witnesses before trial, though a district court may compel such a disclosure
where the defendant makes "a specific showing that disclosure [is] both
material to the preparation of his defense and reasonable in light of the
circumstances surrounding his case."  *United States v. Bielli*, 697 F. Supp.
2d 403, 409 (E.D.N.Y. 2010) (quoting *United States v. Cannone*, 528 F.2d 296,
300-301 (2d Cir. 1975)).  Defendant has not made a specific showing that the
list is material to his preparation of a defense and reasonable under the
present circumstances; the court therefore declines to order the government
to produce its witness list at this time.  *See id.* (denying Fed. R. Crim. P.
16 discovery request for pretrial disclosure of witnesses and confidential
informants because defendant did not make a specific showing of need).
Moreover, pursuant to the Pre-Trial Scheduling Order (ECF No. 57), each party
shall disclose its witness list by November 3, 2014.

(Minute Entry dated 7/9/14.)  No such motion was filed.  Given the approaching trial date, the court expects that all parties will abide by the briefing schedule it set for pre-trial motions and will reject any future motions if they rehash issues or are based on facts and legal arguments that could have been brought to the court's attention in the current motion.

## CONCLUSION

For the foregoing reasons, defendant's motions are denied in their entirety.


**SO ORDERED.**

Dated: September 25, 2014
       Brooklyn, New York


                          _____/s/_____
                          KIYO A. MATSUMOTO
                          United States District Judge
                          Eastern District of New York