UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X

UNITED STATES OF AMERICA,

                                  **MEMORANDUM AND ORDER**

       - against -

                                  12-cr-774(KAM)

IMRAM ISMILE BADOOLAH[1],

               Defendant.

-----------------------------------X

**MATSUMOTO, United States District Judge:**

        On January 25, 2017, Imram Ismile Badoolah[1] ("Mr. Badoolah"), having pled guilty to conspiracy to commit bank and wire fraud in connection with a multi-million dollar mortgage fraud scheme on November 20, 2014, was sentenced to thirty months in custody, a five-year term of supervised release, and $449,721.00 in restitution.  (ECF No. 107, Judgment as to Imran Ismile Badoolah.)  On March 3, 2020, Mr. Badoolah's counsel moved to modify Mr. Badoolah's special conditions of supervised release, arguing that "the condition requiring Mr. Badoolah to provide information regarding the proceeds of the offense infringes on the post-plea Fifth Amendment privilege."  (ECF No. 133, Motion to Modify Conditions of Release.)  On March 24, 2020, Mr. Badoolah was charged with violations of special

---

[1] Since his sentencing, on January 9, 2013, in the Civil Court of the City of New York, County of Queens, Mr. Badoolah legally changed his name to Sultan Imran Ismaail Abdullah Baadoolah.

1

conditions of his supervised release, including Charge One, that Mr. Badoolah "truthfully and completely disclose to the U.S. Probation Office and U.S. Attorney's Office the precise location of the proceeds from the instant offense, whether held in Mr. Badoolah's name or in the name of another person or entity, including the assets and amounts in each location, the dates of any and all transactions or transfers of the assets, the identities of transferees, as well as any asset growth." (ECF No. 138, First Violation of Supervised Release Report at 5; ECF No. 107, Judgment as to Imran Ismile Badoolah at 6(a).) Mr. Badoolah did not object to this condition at the time of sentencing; nor did he seek appellate review. On May 5, 2020, the Court denied Mr. Badoolah's motion to modify his condition of supervised release, which ordered him to "truthfully and completely disclose to the U.S. Probation Office and U.S. Attorney's Office the precise location of the proceeds from the instant offense, whether held in Mr. Badoolah's name or in the name of another person or entity, including the assets and amounts in each location, the dates of any and all transactions or transfers of the assets, the identities of transferees, as well as any asset growth." (ECF No. 142, Memorandum and Order.)

On May 12, 2020, the Court held a status conference regarding Mr. Badoolah's pending violation of supervised release and ordered that Mr. Badoolah "provide to his probation officer

financial information and supporting documentation regarding assets, accounts, automobiles, and persons who appear to have been utilized to acquire or hold assets." (Minute Entry and Docket Order, 5/12/2020.) On September 18, 2020, Mr. Badoolah was arraigned on the violation of supervised release and entered a plea of "not guilty" as to all charges. (ECF No. 145, Minute Entry, 9/18/2020.) On November 20, 2020, Mr. Badoolah withdrew his plea of "not guilty" and pleaded guilty as to Charge Two, Unauthorized Opening of a New Line of Credit without Permission from the Court or Probation Department. (ECF No. 146, Minute Entry, 11/20/2020.)

On February 11, 2021, the Government conducted a deposition of Mr. Badoolah "as part of its efforts to locate and recover the defendant's ill-gotten proceeds." (ECF No. 153, Letter Regarding Conditions of Supervised Release.) On March 17, 2021, the Government submitted a letter to the Court, stating that Mr. Badoolah was not in compliance with the condition that he truthfully disclose the locations of the proceeds acquired through fraud, because during the February 11, 2021 deposition, Mr. Badoolah improperly invoked the Fifth Amendment when asked about the location of proceeds from the fraud to which Mr. Badoolah pled guilty. (*See* ECF No. 154, Deposition Transcript, Exhibit 1 to March 17, 2021 Letter.)

Mr. Badoolah's counsel, however, argues that Mr. Badoolah properly invoked his Fifth Amendment right against self-incrimination during his deposition and that the privilege was not waived by Mr. Badoolah's guilty plea.  (ECF No. 155, Letter Reply to Government's March 17, 2021 Letter.)  As such, Mr. Badoolah argues that he is in compliance with the terms of his supervised release.  (*Id.*)  The Government has since conceded that Mr. Badoolah's right against self-incrimination survives his guilty plea.  (ECF No. 157, Letter Regarding Conditions of Release at 3 ("The defendant's only argument is that his guilty plea does not extinguish Fifth Amendment rights . . . This is not disputed.").)

Moreover, this Court already determined that the special condition, on its face, does not violate Mr. Badoolah's Fifth Amendment protections.  (ECF No. 142, Memorandum and Order at 11-14.)  In *United States v. Singh*, the Second Circuit ruled that "the district court did not err in imposing a condition that [the defendant] answer his probation officer's inquiries truthfully," and that "the district court was well within its discretion to order [the defendant] to provide his financial information."  *United States v. Singh*, 726 F. App'x 845, 850 (2d Cir. 2011).  Additionally, the government has authority pursuant to Title 18 Section 3664(m) of the Mandatory Victims Restitution Act ("MVRA") to use civil enforcement remedies under the Federal

4

Debt Collection Procedures Act ("FDCPA") to enforce orders of restitution, thereby allowing the Government to conduct depositions. (*See infra* Legal Standard, Section I. Government's Authority to Collect Restitution.)   Thus, the sole question before the Court is whether Mr. Badoolah's invocation of the Fifth Amendment during his deposition was improper.

The Court finds that Mr. Badoolah's invocation of the Fifth Amendment, in response to the Government's efforts to enforce the judgment order of restitution, was improper and Mr. Badoolah's failure to answer questions at his deposition is a violation of his condition of supervised release.

<u>**BACKGROUND**</u>

The Court assumes familiarity with the underlying facts in this case.  In brief, Mr. Badoolah was arrested on December 17, 2012, and pled guilty on November 20, 2014 to the first count of a five-count indictment, charging Mr. Badoolah with conspiracy to commit bank and wire fraud in connection with a multi-million dollar mortgage fraud scheme, in violation of 18 U.S.C. §§ 1349, 1343, and 1344.  According to the indictment, Mr. Badoolah's sophisticated conspiracy occurred over a seven year period between approximately August 2005 and April 2012, and involved a scheme to defraud financial institutions by obtaining loans in the names of straw buyers to purchase properties, and by falsifying mortgage loan applications and

5

other documents.  (*See* ECF No. 1, Sealed Indictment.)  On

November 20, 2014, Mr. Badoolah pled guilty to Count 1 pursuant

to a plea agreement with the Government.  (ECF No. 79, Minute

Entry of Guilty Plea; Guilty Plea, Court Exhibit 1, 11/20/2014.)

Paragraphs 9 and 11 of Mr. Badoolah's plea agreement required

that he fully assist the Government in the collection of his

forfeiture and that he disclose all assets to the government.

(Guilty Plea, Court Exhibit 1, 11/20/2014.)  Prior to Mr.

Badoolah's sentencing, a *Fatico* fact-finding hearing was held on

November 8, 2016, to determine loss amounts, for which the

parties filed multiple submissions.[2]  (*See* ECF No. 119,

Transcript of *Fatico* hearing held on November 8, 2016.)  The

Court determined that Mr. Badoolah owed $185,721 to HSBC Bank

and $265,000 to Freddie Mac.  (ECF No. 107, Judgment as to Imran

Ismile Badoolah.)

        Included in Mr. Badoolah's January 25, 2017 sentencing

was an order of restitution in the amount of $449,721.00, and an

order of forfeiture in the amount of $287,170.05.  (*Id.*)  At his

sentencing, the Court advised Mr. Badoolah that he was receiving

a lenient sentence "because it is important . . . that you [Mr.

---

[2] In connection with Mr. Badoolah's sentencing, the Government filed six
sentencing submissions dated August 1, 2016, September 9, 2016, September 16,
2016, December 8, 2016, December 16, 2016, and January 5, 2017, and defense
counsel submitted five sentencing submissions dated July 18, 2016, September
9, 2016, September 30, 2016, December 9, 2016, and December 16, 2016. (*See*
ECF Nos. 90-94, 97-101.)

Badoolah] make every effort on a regular basis to compensate the victims for the losses" and further advised that "if there is a willful failure to pay, that will be grounds to revoke your [Mr. Badoolah's] supervised release."[3]  (ECF No. 120, Sentencing Transcript at 45-46.)  Mr. Badoolah did not object.  As of June 8, 2021, Mr. Badoolah's payments of his judgment obligations total approximately $14,522 in restitution.

On March 3, 2020, Mr. Badoolah's counsel made a motion requesting that the Court "modify the terms of Mr. Badoolah's supervised release," arguing that the condition requiring Mr. Badoolah to provide information regarding the proceeds of the offense "infringes on the post-plea Fifth Amendment privilege." (ECF No. 133, Motion to Modify Conditions of Release.)  On May 5, 2020, the Court denied the motion because "Mr. Badoolah ha[d] not invoked the Fifth Amendment in response to any request or question involving the proceeds of his crimes."  (ECF No. 142, Memorandum and Order at 14.)  The Court further noted that Mr. Badoolah's invocation of the Fifth Amendment was not ripe because he had not invoked the privilege when presented with

---

[3] Under the Sentencing Guidelines, Mr. Badoolah's sentencing range was calculated at 41-51 months imprisonment, a supervised release term of 2-5 years, mandatory restitution, and a fine range between $15,000 and $1,000,000.  Instead, Mr. Badoolah was sentenced to 30 months imprisonment, with credit for Time Served between December 17, 2012 and January 2, 2013, a 5-year supervised release term with special conditions, and $449,721.00 in restitution.

"questions that would provide a link to evidence to prosecute him." (*Id*. at 15.)

Almost a year later, on February 11, 2021, Mr. Badoolah invoked the Fifth Amendment during his deposition in response to most of the Government's questions. (*See* ECF No. 154, Deposition Transcript, Exhibit 1 to March 17, 2021 Letter.) Specifically, Mr. Badoolah invoked the Fifth Amendment after being asked about the locations of the proceeds from the fraud to which Mr. Badoolah pled guilty, Mr. Badoolah's knowledge and relationship with TAT Builders Corporation, his ex-wives whom he claimed to support, and recipients to whom Mr. Badoolah has given money. (*See Id.*) During the Violation of Supervised Release ("VOSR") Hearing on April 22, 2021, the Court asked Mr. Badoolah's counsel to provide reasons why the lines of questioning by the Government at the deposition were incriminating. (Unofficial Transcript of VOSR Hearing, 4/22/2021 at 6-7.)

Following the April 22, 2021 hearing, both Mr. Badoolah and the Government submitted further briefing regarding Mr. Badoolah's invocation of the Fifth Amendment and whether Mr. Badoolah violated his condition of supervised release. (ECF No. ECF No. 157, Letter Reply Regarding Conditions of Release; ECF No. 159, Letter Regarding Conditions of Release.) Specifically, in his May 14, 2021 letter, Mr. Badoolah's counsel provided

reasons why answering the questions posed to defendant would create a risk of self-incrimination, including potential "exposure for a litany of financial crimes beyond bank fraud," and "new criminal liability beyond the single charge of bank fraud." (ECF No. 157, Letter Reply Regarding Conditions of Release at 3-4.) In its May 27, 2021 letter, the Government maintained that "defendant has not met his burden of invoking a valid claim of privilege" and that defendant's concerns of self-incrimination remain "remote and speculative." (ECF No. 159, Letter Regarding Condition of Release at 3.)

## LEGAL STANDARD

### I.   Government's Authority to Collect Restitution

The Government "shall be responsible for collection of an unpaid fine or restitution," 18 U.S.C. § 3612(c), and "may enforce a judgment . . . against all property or rights to property of the person fined," 18 U.S.C. § 3613(a), or against the property or rights to property of a person ordered to pay restitution. 18 U.S.C. § 3664(m). "The [G]overnment may enforce restitution orders arising from criminal convictions using the practices and procedures for the enforcement of a civil judgment under federal or state law as set forth in the Federal Debt Collection Procedures Act ('FDCPA')." *United States v. Cohan*, 798 F.3d 84, 89 (2d Cir. 2015); *see also United States v. O'Brien*, No. 19-CR-3895, 2021 WL 1051540, at 3 (2d

9

Cir. 2021) (noting it is "well-settled" that the government may use post-judgment remedies under the FDCPA to enforce restitution); *United States v. Mays*, 430 F.3d 963, 966 (9th Cir. 2005) ("Although the MVRA is a criminal statute, it expressly . . . provides that the FDCPA's civil enforcement remedies may be used to enforce orders of restitution under the MVRA.").

The FDCPA provides, in relevant part, that "the United States may have discovery regarding the financial condition of the debtor in the manner in which discovery is authorized by the Federal Rules of Civil Procedure in an action on a claim for a debt." 28 U.S.C. § 3015(a). The government, therefore, may invoke the Federal Rules of Civil Procedure to seek discovery against a defendant who owes restitution. *See United States v. Scott*, No. 07-CR-0304, 2009 WL 10703347, at 3 (E.D.N.Y. 2009) (holding that Section 3015(a) authorizes the government to issue subpoenas for credit reports under Fed. R. Civ. P. 69 to enforce restitution); *United States v. Ceparano*, No. 98-CR-0922, 2009 WL 8690129, at 5 (E.D.N.Y. 2009)(same); *cf. Mays*, 430 F.3d at 965-66 (allowing the government to issue a writ of garnishment under the FDCPA to satisfy a restitution judgment). The tools at the government's disposal, therefore, include Rule 69(a)(2) of the Federal Rules of Civil Procedure, which applies to the enforcement of a money judgment, and authorizes a judgment creditor to "obtain discovery from any person—including the

judgment debtor—as provided in these rules."  Under this legal
framework, the discovery methods in the Federal Rules of Civil
Procedure authorize the government to use depositions to assist
in the enforcement and collection of a restitution judgment.
Fed. R. Civ. P. 27-28, 30-32; *see United States v. Stadtmueller*,
No. 15-CR-59, 2018 WL 6204434, at 2-3 (E.D. Wash. 2018) (finding
that Section 3015(a) of the FDCPA authorizes the government to
depose a criminal defendant to collect restitution); *United
States v. Woods*, No. 05-CR-131, 2009 WL 10681742, at 2 (E.D.N.C.
2009) (upholding motion to compel a deposition to recover
restitution under Section 3015(a) of FDCPA).

        The aforementioned legal framework plainly allows the
government to discover financial information pursuant to FDCPA
civil procedures after restitution is imposed, as the government
seeks to do here.  *See Cohan*, 798 F.3d at 89 (allowing FDCPA
procedures to enforce an "already existing order of restitution"
in an underlying criminal case); *Mays*, 430 F.3d at 966 (holding
FDCPA procedures are available as post-judgment remedies in
criminal cases).  The FDCPA can be utilized, notwithstanding
contrary criminal procedures, because the enforcement of
restitution does not implicate the imposition of restitution,
and therefore "is not part of defendant's criminal sentencing."
*Cohan*, 798 F.3d at 89.  Rather, "collecting the restitution owed
is decidedly civil in nature."  *Id*.  The government, therefore,

"is free to pursue . . . civil remed[ies] . . . under an existing criminal docket number without transforming the proceeding into a criminal matter."  *Id.*  "[N]othing precludes the government from initiating a collection proceeding under an existing criminal docket number in order to collect a fine or restitution ordered as part of the criminal sentence."  *Id.* (*quoting United States v. Kollintzas*, 501 F.3d 796, 800 (7th Cir. 2007).  Thus, the government may depose Mr. Badoolah, in accordance with the Federal Rules of Civil Procedure, to enforce the restitution Mr. Badoolah already owes.

## II.  <u>Fifth Amendment Privilege</u>

The Fifth Amendment states that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  The Fifth Amendment privilege applies to a communication that is testimonial, incriminating, and compelled. *See United States v. Hubbell*, 530 U.S. 27, 34-38, 120 S. Ct. 2037, 147 L.Ed.2d 24 (2000).  The privilege extends to "'any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.'"  *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189, 124 S. Ct. 2451, 159 L.Ed.2d 292 (2004)(quoting *Kastigar v. United States*, 406 U.S. 441, 445, 92 S. Ct. 1653, 32 L.Ed.2d 212 (1972)).

For testimony to be incriminating, there must be "reasonable ground to apprehend danger to the witness from his being compelled to answer.... [T]he danger ... must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things." *Hiibel*, 542 U.S. at 190, 124 S. Ct. 2451 (quotations omitted).  The defendant must demonstrate that his testimony would "furnish a link in the chain of evidence needed to prosecute" the defendant for a crime. *Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951).

A person cannot exert a Fifth Amendment privilege merely because he declares answering would incriminate himself. *Id*.  Nor does the privilege extend to cases where disclosure presents no reasonable danger of incrimination, or where the risk is an extraordinary and barely possible contingency. *Hiibel*, 542 U.S at 189.  Rather, the danger of self-incrimination must be real, not remote or speculative. *Est. of Fisher v. Comm'r*, 905 F.2d 645, 649 (2d Cir. 1990).  "When the danger is not readily apparent from the implications of the question asked or the circumstances surrounding the inquiry, the burden of establishing its existence rests on the person claiming the privilege." *Est. of Fisher*, 905 F.2d at 649.

Moreover, where there can be no further incrimination for a charge, there is no basis for the Fifth Amendment

privilege.  *Mitchell v. United States*, 526 U.S. 314, 326, 119 S. Ct. 1307, 1310, 143 L. Ed. 2d 424 (1999).  For example, once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime.  *Reina v. United States*, 364 U.S. 507, 513, 81 S. Ct. 260, 5 L.Ed.2d 249 (1960).

## DISCUSSION

Mr. Badoolah invoked his Fifth Amendment privilege in response to specific questions at his deposition.  (*See* ECF No. 154, Exhibit 1 to March 17, 2021 Letter.)  Consequently, "[a]s to each question to which a claim of privilege is directed, the court must determine whether the answer to that particular question would subject the witness to a 'real danger' of ...[in]crimination."  *Rogers v. United States*, 340 U.S. 367, 374, 71 S. Ct. 438, 442, 95 L. Ed. 344 (1951).

## I.  The Locations of the Proceeds from the Fraud

During the deposition, the Government asked a series of questions related to the location of the funds from the fraud to which defendant pled guilty.  (See ECF No. 154, Exhibit 1 to March 17, 2021 Letter.)  For instance, the Government asked and Mr. Badoolah invoked the Fifth Amendment as to the following questions:

- "Where are the proceeds from your fraud that you pleaded guilty to?"  (ECF No. 154 at 63:5-6.)

14

- "What bank accounts did the proceeds of your fraud go into?"  (ECF No. 154 at 63:15-16.)

- "How did you transfer the assets from your fraud?" (ECF No. 154 at 64:11-12.)

Mr. Badoolah's counsel contends that Mr. Badoolah's invocation of the Fifth Amendment in response to these and similar questions was proper because there is "reasonable cause to apprehend danger."  (ECF No. 157, Letter Reply Regarding Conditions of Release at 3.)  Mr. Badoolah's counsel generally speculates that "were Mr. Badoolah to hide money from the government as alleged, he could face exposure for a litany of financial crimes beyond bank fraud."  (*Id.*)

The Court preliminarily finds that, contrary to defense counsel's argument, the government has not alleged that Mr. Badoolah is hiding money.  Rather the government is exercising its authority to recover restitution owed by Mr. Badoolah to his violations.  (*See supra* Legal Standard, Section I. Government's Authority to Collect Restitution.)  Mr. Badoolah has not offered any meaningful detail as to the risks his truthful responses would create and has not identified any additional crimes for which he could be prosecuted, as a result of his truthful disclosures.  "It is well established that the privilege protects against real dangers, not remote and

speculative possibilities." *Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478, 92 S. Ct. 1670, 1675, 32 L. Ed. 2d 234 (1972).  Mr. Badoolah has not concretely identified what further crimes he would be charged with by providing answers to questions related to proceeds of the initial fraud and the recovery of restitution for his victims.

Moreover, as the Government notes, Mr. Badoolah is protected by the condition in his plea agreement that Mr. Badoolah may not be further prosecuted by the United States Attorney's Office "for conspiring to commit bank and wire fraud, on or about and between August 2005 and April 2012."  (Guilty Plea, Court Exhibit 1, 11/20/2014 at 4.)  As the questions asked during the deposition require Mr. Badoolah to disclose the location of the funds which he has already been convicted of fraudulently acquiring, Mr. Badoolah has failed to establish why answering these narrowly tailored questions would expose Mr. Badoolah to prosecutions for additional crimes beyond the offense at issue from which he is already protected or of which he has already been convicted.  Pursuant to the Supreme Court's decision in *Reina v. United States*, the Fifth Amendment does not extend to crimes for which the Defendant is already convicted or protected by a plea agreement. *Reina v. United States*, 364 U.S. 507, 513, 81 S. Ct. 260, 264, 5 L. Ed. 2d 249 (1960) ("the ordinary rule is that once a person is convicted of a crime, he

16

no longer has the privilege against self-incrimination as he can
no longer be incriminated by his testimony about said crime.")
Consequently, the Court finds that Mr. Badoolah violated the
condition of supervised release requiring that he "truthfully
and completely disclose to the U.S. Probation Office and U.S.
Attorney's Office the precise location of the proceeds from the
instant offense, whether held in Mr. Badoolah's name or in the
name of another person or entity, including the assets and
amounts in each location, the dates of any and all transactions
or transfers of the assets, the identities of transferees, as
well as any asset growth," by refusing to answer questions
related to the recovery of proceeds of the fraud of which he
stands convicted.

## II.  Mr. Badoolah's Knowledge and Relationship with TAT Builders Corporation

During Mr. Badoolah's deposition, the Government asked
Mr. Badoolah questions about a real estate company, through
which he conducted fraudulent mortgage transactions, called TAT
Builders Corporation in Queens, New York[4], to which Mr. Badoolah
invoked his Fifth Amendment privilege.  (*See* ECF No. 154,

---

[4] Between 2005 and 2011, Mr. Badoolah worked for TAT Builders Corporation in
Queens, New York, owned by his former wife, Ms. Tatou.  (ECF No. 85,
Presentence Investigation Report at ¶ 58.  Mr. Badoolah reports that he owned
a 10% share of the business at some point and signed his percentage to Ms.
Tatou's father at the time of the instant arrest in exchange for $2500.
(*Id.*)  Mr. Badoolah reported earning approximately $5000 per month while
working for TAT Builders Corporation.  (*Id.*)

17

Deposition Transcript, Exhibit 1 to March 17, 2021 Letter at
66.)  The Government asked, and Mr. Badoolah invoked the Fifth
Amendment to, the following questions:

- "Do you have ownership interest of any sort in TAT
  Builders Corporation?"  (*Id*. at 64.)

- "Did you tell probation that the company was owned
  by your former wife Noura Tatou?" (*Id*. at 66.)

- "Do you have any relationship to a Chase Bank
  account associated with TAT Builders Corporation?"
  (*Id*. at 66.)

Mr. Badoolah's counsel hypothetically maintains that
"if Mr. Badoolah had some relationship to TAT's bank account,
and that account was used to commit a financial crime like money
laundering, then Mr. Badoolah would be exposed to criminal
charges."  (ECF No. 157, Letter Reply Regarding Conditions of
Release at 3.)  The Court again finds that Mr. Badoolah's
speculative and hypothetical basis for invoking the Fifth
Amendment is improper in response to these and similar
questions.

In *Hiibel v. Sixth Judicial Dist. Court of Nevada,
Humboldt County*, the petitioner challenged his conviction,
arguing that the Fifth Amendment protected his right not to
answer any questions by police officers, including their demand
that he identify himself.  *Hiibel*, 542 U.S. at 190-91, 124 S.Ct.

18

2451.  The Supreme Court rejected petitioner's challenge,
finding that petitioner's disclosure of his name would not
incriminate him, noting that "while we recognize petitioner's
strong belief that he should not have to disclose his identity,
the Fifth Amendment does not override the Nevada Legislature's
judgment to the contrary absent a reasonable belief that the
disclosure would tend to incriminate him."  *Id*.  Similarly,
though Mr. Badoolah's disclosure of a specific bank account
could theoretically create a risk of prosecution for other
financial crimes, there is no inherent risk or danger in
disclosing information about the Chase account associated with
TAT Builders Corporation.  Mr. Badoolah has failed to explain
why this disclosure could create a reasonable belief of risk of
criminal liability, beyond the offense for which he already
stands convicted.  (*See supra* at Discussion, Section I.)
Moreover, the Court again finds that Mr. Badoolah has violated
his condition of supervised release requiring that he
"truthfully and completely disclose to the U.S. Probation Office
and U.S. Attorney's Office the precise location of the proceeds
from the instant offense, whether held in Mr. Badoolah's name or
in the name of another person or entity, including the assets
and amounts in each location, the dates of any and all
transactions or transfers of the assets, the identities of

19

transferees, as well as any asset growth," by not answering questions related to TAT Builders Corporation.

### III. Information on Ex-Wives and Other Proceed Recipients

The Government has also asked Mr. Badoolah questions about his ex-wives and their finances based on evidence that they received funds from Mr. Badoolah. (*See* ECF No. 154, Deposition Transcript, Exhibit 1 to March 17, 2021 Letter.) Similarly, Mr. Badoolah has been asked about money he allegedly has given to other relatives. (*Id.*) Specifically, the Government asked Mr. Badoolah the following questions to which he invoked the Fifth Amendment:

- "In what way does your wife Amir Abdulah earn money?" (*Id.* at 23.)

- "In the dependents on that tax return, you list your ex-wife Noura Tatou and the name is spelled her last name is spelled T A T O O not T A T O U; is that an alternative spelling that she uses or is that a typo?" (*Id.* at 44.)

- "Have you given more than $100 to your [adult] son in the past year?" (*Id.* at 60.)

Mr. Badoolah's counsel argues that "the government seeks to elicit testimony on whether Mr. Badoolah or a co-conspirator hid the proceeds of the mortgage scheme." (ECF No. 157, Letter Reply Regarding Conditions of Release at 3-4.)  As

20

with the previous lines of questioning, Mr. Badoolah's explanation as to why he faces self-incrimination is remote and speculative.  *See Zicarelli v. New Jersey State Comm'n of Investigation*, 406 U.S. 472, 478, 92 S. Ct. 1670, 1675, 32 L. Ed. 2d 234 (1972).  Additionally, as the Supreme Court explained in *Hiibel*, there is nothing inherently dangerous in providing identifying information about Mr. Badoolah's ex-wives and other family members who received funds from Mr. Badoolah.  *Hiibel*, 542 U.S. at 190-91, 124 S. Ct. 2451.  The Court finds that Mr. Badoolah has violated his condition of supervised release requiring that he "truthfully and completely disclose to the U.S. Probation Office and U.S. Attorney's Office the precise location of the proceeds from the instant offense, whether held in Mr. Badoolah's name or in the name of another person or entity, including the assets and amounts in each location, the dates of any and all transactions or transfers of the assets, the identities of transferees, as well as any asset growth," in failing to answer questions regarding the transfer of funds to family members and current and former spouses and the proper spelling of their names.

## IV.   *In Camera* **Review**

The Government argues that Mr. Badoolah has not met his burden and could have requested that the Court inspect and evaluate the relevant information *in camera* to evaluate Mr.

Badoolah's perception of the danger of prosecution.  (ECF No. 159, at 3.)  Indeed, as the Second Circuit explained in *Est. of Fisher v. Comm'r*, "when the incriminatory potential . . . is not clear on its face, an *in camera* conference is consonant with the notion that a witness need not surrender 'the very protection that the [Fifth Amendment] privilege is designed to guarantee' in order to invoke it."  *Est. of Fisher v. Comm'r*, 905 F.2d 645, 650 (2d Cir. 1990) (citing *Hoffman*, 341 U.S. at 486, 71 S. Ct. at 818); *see also Kerr v. United States District Court*, 426 U.S. 394, 406, 96 S. Ct. 2119, 48 L.Ed.2d 725 (1976) (suggesting that *in camera* review is a "highly appropriate and useful means of dealing with claims of governmental privilege"); *United States v. Nixon*, 418 U.S. 683, 706, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) (*in camera* review of documents sought by special prosecutor appropriate in light of claim of presidential privilege).

Mr. Badoolah's failure to request *in camera* review by the Court further demonstrates Mr. Badoolah's unwillingness to provide a complete and truthful accounting of his financial condition and the whereabouts of the ill-gotten gains from Mr. Badoolah's criminal activities.

## CONCLUSION

For the foregoing reasons, the court finds that Mr. Badoolah's invocation of the Fifth Amendment to the Government's

questions is without merit.  Mr. Badoolah's lenient sentence was predicated on the clear sentencing goal that he pay restitution to his victims and that he provide complete and truthful financial disclosures.  By failing to comply with the Government's efforts to collect the restitution judgment, Mr. Badoolah has frustrated the rights of his victims to recover their losses.  Mr. Badoolah has violated the following condition of supervised release: Mr. Badoolah shall truthfully and completely disclose to the U.S. Probation Office and U.S. Attorney's Office the precise location of the proceeds from the instant offense, whether held in Mr. Badoolah's name or in the name of another person or entity, including the assets and amounts in each location, the dates of any and all transactions or transfers of the assets, the identities of transferees, as well as any asset growth.

**SO ORDERED.**

Dated:      August 19, 2021
            Brooklyn, New York


                                    /s/
                        _____
                        **Hon. Kiyo A. Matsumoto**
                        United States District Judge
                        Eastern District of New York